DeAnne Casperson, Esq. (ISB No. 6698)
dcasperson@workandwage.com
Amanda E. Ulrich, Esq. (ISB No. 7986)
aulrich@workandwage.com
Ryan S. Dustin, Esq. (ISB No. 8683)
rdustin@workandwage.com
CASPERSON ULRICH DUSTIN PLLC
356 W. Sunnyside Rd., Suite B
Idaho Falls, ID 83402
Telephone: (208) 524-0566
Facsimile: (208) 745-2523

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
IN THE DISTRICT OF IDAHO

| | |
|---|---|
| JEREMY CLARKE,<br><br>            Plaintiff,<br><br>v.<br><br>WHITE PINE CHARTER SCHOOL, INC., a political subdivision of the State of Idaho; EMMALEE ROBINSON, in her individual and official capacity; JONI LARSEN, in her individual and official capacity; JIM SEAMANS, in his individual and official capacity; MARK DUNCANSON, in his individual and official capacity; DEE ARMSTRONG, in his individual and official capacity; and JOANNA STARK, in her individual and official capacity,<br><br>            Defendants. | Case No.<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>Filing Fee: $400.00 |

Plaintiff, Jeremy Clarke ("Plaintiff" or "Clarke"), by and through his counsel of record,

Casperson Ulrich Dustin PLLC, and as a cause of action against Defendants White Pine Charter

School, Inc.; Emmalee Robinson, in her individual and official capacity; Joni Larsen, in her

individual and official capacity; Jim Seamans, in his individual and official capacity; Mark

Duncanson, in his individual and official capacity; Dee Armstrong, in his individual and official

capacity; and Joanna Stark, in her individual and official capacity, complains and alleges as follows:

## JURISDICTION AND VENUE

1. This is an action brought under the laws of the United States, specifically 42 U.S.C. § 1983, and alleges violations of rights protected by the United States Constitution; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*;  the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*; the Idaho Wage Claim Act; and for violations of Idaho common law and statutory law, including breach of contract, as more particularly provided herein.

2. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343; 42 U.S.C. § 12117; and 29 U.S.C. § 2617.

3. This court has pendent jurisdiction over Plaintiff's state claims pursuant to 28 U.S.C. § 1367 because there is a common nucleus of operative facts as to Plaintiff's federal and state claims.

4. Venue in this action properly lies in the United States District Court for the District of Idaho, Eastern Division, pursuant to 28 U.S.C. § 1391(b) because the claims arose in this judicial district; and venue also properly lies in this district pursuant to 42 U.S.C. § 12117 and 29 U.S.C. § 2617 because the unlawful employment practices were committed in this judicial district.

## PARTIES

5. Clarke is a male citizen and resident of the United States, who is, and was at all times relevant to the Complaint, a resident of Bonneville County, Idaho.

6. Defendant White Pine Charter School, Inc. ("White Pine") is a publically-funded charter school in the State of Idaho and a political and governmental subdivision of the State of Idaho with its principal place of business in Ammon, Idaho.

7.  Defendants Emmalee Robinson, Joni Larsen, Jim Seamans, Mark Duncanson, Dee Armstrong, and Joanna Stark are residents of the United States and members of the Board of Trustees of White Pine ("Board").  All are sued in both their individual and official capacities, and at all times relevant hereto, had supervisory authority over Clarke.

8.  At all times relevant to this Complaint, White Pine regularly employed fifteen or more persons whose services were performed in a public school in the State of Idaho and was engaged in an industry affecting commerce. Consequently, White Pine's conduct is properly regulated by 42 U.S.C. § 12101, *et seq.* and 29 U.S.C. § 2601, *et seq*.

## FACTS COMMON TO ALL COUNTS

9.  Clarke realleges paragraphs 1 through 8 as if fully incorporated herein.

10. In 2012, Clarke began working for White Pine as principal, which at the time was a K-8 school.  Clarke served as an administrator for approximately 8 years, having an advanced educational background in education.

11. Clarke's administrative duties expanded as the enrollment increased and the school began plans for expansion.  In the beginning of the school year in the fall of 2019, Clarke's job title was  "CEO/Administrator."  In December 2019, Clarke's title was changed to "Executive Director."

12. Over the course of Clarke's employment, White Pine had a history of excellence.   It received the only Five Star evaluation in eastern Idaho from the State of Idaho and has been recognized as a strong academically achieving school.

13. Over the course of his employment, Clarke received favorable reviews of his performance by the Board.  The Board generally evaluated Clarke's performance in April of each year. Based on the Board's past practice, Clarke understood the Board would again review his performance in April 2020.

14.    As the Board changed over the years, Clarke successfully worked with many different members and weathered the volatile disputes and disagreements between Board members.

15.    Clarke and the Board entered into one-year administrator contracts prepared by the State of Idaho renewed each year from 2012 through 2019.

16.    Because of Clarke's excellent performance over the years, the Board on several occasions had discussed during Board meetings entering into a multi-year contract with Clarke.

17.    In approximately October of 2018, Clarke participated in and helped White Pine get approved by the Idaho Public Charter School Commission to expand White Pine to include a high school, the White Pine STEM Academy, a 7-12 school.

18.    As a result of the plans for expansion, Clarke was very busy helping to get all the pieces in place to get the STEM Academy up and running and to expand the current student enrollment.

19.    In June 2018, the current Business Manager resigned.

20.    In July 2018, the Board chose to employ a new full-time Chief Financial Officer/Business Manager ("Business Manager") who held an MBA and Master of Accountancy from Idaho State University.  A couple of the Board members discussed this potential hire with Clarke and explained that the new Business Manager would work under Clarke, but would report directly to the Board chair and treasurer on financial matters to ensure the school operated with fiscal responsibility and within resource allocations.

21.    The Board members explained that hiring a new Business Manager would alleviate some of the burden placed on Clarke and provide someone with more expertise.

22.    Clarke was excited to have the assistance and help of a well-qualified Business Manager who could ensure fiscal responsibility and accounting, particularly since the expansion of White Pine was greatly increasing his responsibilities.   In addition, the new Business

Manager had an extensive accounting background, which was helpful to Clarke because his expertise and background is focused on education.

23.   In July of 2018, the Board asked Clarke to cancel his summer plans because they had so much to get done at the school.  Although Clarke's contract did not require that he work those days, he did the work without compensation because of his dedication to the school. The new Business Manager also worked through the summer, as well.

24.   In the summer of 2019, the Board again asked Clarke to work during the summer in order to get the STEM Academy ready, but compensated him this time with a supplemental contract.

25.   As White Pine expanded, Clarke's responsibilities and duties continued to expand as well. As a result, Clarke relied upon other administrative positions to take on some of the load of the administrative oversight, particularly the Business Manager because of his expertise.

26.   Every year, White Pine performed a fiscal audit to ensure finances were being handled appropriately.  The most recent was completed in October of 2019 and everything was in order.  Clarke and the Board were both pleased with the new Business Manager's performance.

27.   In addition, White Pine posted its financial information, including contracts, bonuses, etc., on its website to ensure there was transparency in the use of any of its public funds.

28.   On or about April 30, 2019, Clarke and the Board continued Clarke's employment with a one year administrator contract approved by the State of Idaho for the period of  July 1, 2019, through June 30, 2020 ("2020 Administrator Contract").  A true and correct copy of the 2020 Administrator Contract is attached hereto as Exhibit A.

29.   For purposes of considering entering into the contract referenced above, the Board cited Idaho Code § 74-206(1)(b) in the agenda for the executive session related to Clarke.

30.   In approximately May of 2019, Clarke participated in and helped White Pine receive a $800,000 federal CSP grant through Bluum, a non-profit organization in Idaho focused on education, for purposes of helping to expand White Pine.

31.   On numerous occasions, the Board expressed its favorable review of Clarke's performance in advancing the academic excellence and expansion of White Pine.

32.   In May 2019, new Board members were elected, but electioneering allegations ensued, which resulted in the election being overturned after an investigation.  In addition, the Board chair was accused of authorizing an investigation into the electioneering without following the proper procedure.

33.   In spite of the chaos happening with the Board, Clarke oversaw the opening of the STEM Academy in August 2019, working through the summer and on nights and weekends to get everything ready for the new school.

34.   In September and October 2019, the STEM Academy was dedicated and over 50 legislators visited the new high school.  A report on the recent audit was also presented and everything according to the audit was in order.

35.   On several occasions, the Board indicated it wanted to compensate both Clarke and the Business Manager for all of the extra work involved in expanding the school and obtaining the grant.

36.   In November 2019, new Board elections were held and Robinson, Duncanson, and Seamans were elected.

37.   At a regularly scheduled meeting on December 2, 2019, all three new Board members were sworn in to office.  As a result, both new members and exiting Board members were present.

38.   As previously suggested by the Board, Clarke requested prior to the meeting that the Board include on the agenda a topic for an executive session to evaluate his performance for

purposes of the Board's prior promise of a bonus, a raise, and to discuss amending his contract to a longer term.

39.    As a result of Clarke's request, the agenda included a topic under "Executive Session" and referenced Idaho Code § 74-206(1)(b), which specifically references the evaluation of an employee.

40.    At the regularly scheduled meeting on December 2, 2019, the Board discussed Clarke's performance, recognizing the substantial work Clarke had accomplished.   After the discussion, the Board concluded the executive session and in an open session moved and approved bonuses to both Clarke and the Business Manager due to the start of the new high school, a raise and new title to Clarke of Executive Director, and an amendment to Clarke's current contract to a three year term.

41.    On or about December 2, 2019, the Board and Clarke signed an administrator contract that amended Clarke's term of employment so that it ended on June 30, 2023 ("2023 Administrator Contract").  A true and correct copy of the 2023 Administrator Contract is attached hereto as Exhibit B.

42.    In the same meeting on December 2, 2019, the current Board chair resigned and Robinson became the new Board chair.

43.    On December 19, 2019, the Board appointed Armstrong to be a new member of the Board after another Board member resigned.

44.    Clarke did his best to work with the changing Board members over the years.

45.    Clarke was concerned when Robinson became a Board member and the chair because she knew personal details about Clarke's disability and treatment he had needed in the past.

46.    Shortly after becoming a Board member, Robinson told Clarke, "You aren't going to like it when I'm in there."  Clarke felt that Robinson's statement was a threat, but tried his best

to work with every Board member, including Robinson.

47. On or about January 10, 2020, the State of Idaho and Bluum conducted training for the Board on open meeting laws, and other board-governance issues. During the training, the State and Bluum official commented that the Business Manager was doing an excellent job.

48. Shortly after this training on open meeting law, on or about January 28, 2020, the Board "cured" alleged opening meeting violations related to a parking lot and science lab, expenditures that were previously discussed and authorized.

49. During the meeting, no issues were raised regarding any alleged open meeting violations related to Clarke's amended contract, raise, or bonus.

50. In early January of 2020, Clarke began experiencing issues with his disability. Clarke was working long hours and had been under significant stress to get the STEM Academy up and running, as well as dealing with changes and contentions within the Board, and the stress was beginning to exacerbate his condition.

51. In mid-January of 2020, Robinson called Clarke and asked him to explain where all of White Pine's money is kept. Clarke thought this was an odd question in that the Board worked directly with the Business Manager to manage White Pine's finances. In addition, White Pine posts its financial transactions on the school's website so that the use of funds is publicly available to not just the Board, but all of those with an interest.

52. Due to a family medical emergency, Clarke told Robinson his understanding of where monies are kept, but asked Robinson to contact the Business Manager who managed and worked with the Board over fiscal issues. Clarke explained that the Business Manager would have more detailed information to answer Robinson's questions immediately.

53. On or around January 22, 2020, the Board held a regular meeting and asked questions of the Business Manager regarding expenditures and fiscal management. The Business Manager

had previously resigned out of concern that Robinson would be difficult to work with and that he felt the Board no longer trusted him.  The Business Manager attended the Board meeting to answer questions only.  However, later in the meeting, the Board claimed in an open meeting that it decided to "fire him," although he had already submitted his resignation.

54.     As a result of the Board's retaliatory act to "fire" the Business Manager in a public meeting and Robinson's disparaging statements about the Business Manager, Clarke became increasingly worried about the volatile actions of the Board, particularly Robinson, and felt threatened by her unprofessional handling of the concern.

55.     During the same meeting, Robinson moved the Board to pay for a forensic audit of White Pine's finances.  The Board voted to table the motion, but Robinson allegedly proceeded with an audit anyway although no audit has been produced or provided to Clarke in spite of requesting it on numerous occasions.

56.     In a Board meeting on January 28, 2020, the Board discussed with Clarke his knowledge of alleged mismanagement by the Business Manager.  Clarke acknowledged that he learned of the alleged fiscal mismanagement at the same time the Board did.  During the meeting, the Board admitted to Clarke that he was not responsible for the alleged actions of the Business Manager.  Clarke has never been provided an audit or accounting of the allegations against the Business Manager.

57.     Shortly thereafter, Robinson began calling Clarke on a near daily basis expressing her anger toward the Business Manager and threatening that he should be in handcuffs.  Again, Clarke was very concerned with Robinson's conduct and unprofessional comments.

58.     At or near the same time, Robinson began giving unreasonable demands and deadlines to Clarke.  In addition, she began questioning Clarke's actions, including actions that had been directed by or approved and signed off by the Board.

59.   On February 10, 2020, Robinson called Clarke and informed him that the Board violated open meeting law when it approved the amendment of his contract to a three-year term.

60.   Robinson claimed that the Board incorrectly cited to the wrong subsection of Idaho Code § 74-206(1), which Clarke found surprising, considering the recent training and the alleged open meeting violations the Board corrected shortly after the training.   Further, Clarke explained that this same subsection had been used in the past for similar actions.

61.   Based on Robinson's conduct, Clarke suspected that Robinson was looking for any reason to allegedly void the 2023 Administrator Contract.

62.   In spite of Clarke's objections, on February 12, 2020, the Board held a meeting and claimed as a result of its violations of open meeting law, Clarke's 2023 Administrator Contract, bonus, and raise authorized and approved on December 2, 2020, were null and void.   The Board re-approved only the bonus to Clarke during this meeting, claiming the 2020 Administrator Contract governed his employment.   Clarke's bonus was reflected in the schools financials posted on the website.

63.   Based on information and belief, the Board knew of its alleged violation of open meeting law regarding Clarke's amended contract, raise, and bonus, in mid-January and before it "cured" the other alleged open meeting violations during a meeting on January 28, 2020.

64.   Any attempt by the Board to cure an alleged violation of open meeting law was untimely.

65.   On or about February 14, 2020, Robinson sent Clarke an email insisting that he provide numerous items in a one-week time frame, including a written 5 year plan for both schools, a written plan for the accreditation, a written marketing plan, and a written plan for the financial future of this school year and the following school year.   Given the impossibility of providing all of those written plans in a single week and the fact that Clarke's evaluation had generally been done in April, Clarke felt that Robinson was intentionally trying to set

him up for failure.

66.    On or about February 20, 2020, Clarke's health care provider placed him on FMLA leave for two weeks to address his medical condition, which was getting increasingly worse due to Robinson's actions and threatening comments.  Clarke provided White Pine and the Board a letter from his treating physician to excuse him for the next two weeks.

67.    Clarke followed up the doctor's letter with the necessary paperwork for FMLA leave, which was extended because his condition was not improving.

68.    Clarke received no questions or concerns about his FMLA paperwork from White Pine or the Board members.

69.    On or about February 21, 2020, the Board held a meeting during which it appeared it intended to discuss allegations about Clarke.  Clarke was shocked.  The Board had previously acknowledged he was not responsible for the Business Manager's alleged actions, but appeared now to be accusing him of issues unknown to him.

70.    Although Clarke had received no notice of any allegations against him, was assured by the Board he was not responsible for the Business Manager's actions, and was on FMLA leave, he felt he had no choice but to attend due to the volatile actions of Robinson.  Due to his disability, Clarke was in no condition to attend the meeting.

71.    At the meeting, Clarke was asked questions during an executive session, concerning an alleged audit that Clarke was not provided, the Board claimed it did not have at the present time, and the Board provided no written notice of any of the audit findings so Clarke could prepare and respond.

72.    The Board again shocked Clarke with the suggestion that he resign.  Although Clarke and the Board discussed the possibility of Clarke resigning if the Board no longer desired his services, Clarke indicated he would only resign if appropriate terms could be met.  Further,

according to Board policy, a resignation must be in writing.

73.   At the end of the meeting, the Board placed Clarke, who was already on FMLA leave for his serious medical condition, on paid administrative leave.

74.   On numerous occasions, Clarke requested information from the Board regarding any allegations against him.  The Board provided no allegations and nothing from an alleged audit.

75.   Clarke's neighbors informed him that their child, who attended White Pine, was told by one of his teachers that Clarke had been fired, but it was not official yet.  In addition, other people informed Clarke and his wife of derogatory comments that were being said by the Board members regarding Clarke.

76.   Clarke was forced to obtain an attorney to represent him due to the Board's actions. Through his attorney, Clarke objected to White Pine's treatment of him, especially while he was struggling with his disability and on FMLA leave.

77.   Clarke did not resign his position, but requested the Board provided him notice of any allegations so that he could defend himself. Clarke was very dedicated to White Pine – his children attended the school. Clarke felt Robinson was trying to force him out without cause.

78.   Legal counsel for the Board and Clarke exchanged communications regarding a date for a due process hearing after the Board notified Clarke in writing what the allegations were so he could prepare for the hearing.

79.   Because of Clarke's FMLA leave and the paid administrative leave, dates in April were proposed for the due process hearing.  Clarke's medical provider indicated that he projected Clarke could return to work from his FMLA leave part time, starting March 30, 2020.  As a result, the due process hearing needed to occur after Clarke had recovered.

80.   Without any warning or notice, however, the Board gave notice to Clarke on April 1, 2020,

that it had terminated his employment on March 31, 2020.  The Board claimed its decision was effective March 31, 2020, cutting off Clarke's medical insurance and ability to obtain continued treatment for his disability and cover necessary care for his family members without any notice.

81.     Further, the Board ended all contractually-required payments to Clarke, leaving him without funds to purchase insurance or obtain COBRA benefits.

82.     In his termination letter, for the first time, Clarke was provided written notice of any allegations against him.  However, the Board refused, and has continued to refuse, to produce any alleged audit supporting its allegations or give him any opportunity to respond after receiving notice of the allegations.

83.     In addition, the allegations against Clarke were primarily actions that had been approved or directed by previous Board members or were within Clarke's discretion as the top administrator for White Pine.

84.     At a later date, after driving the Business Manager to resign and before firing Clarke, Robinson openly admitted she intended to "clean house" at White Pine.

85.     Robinson and the Board members have continued to make false statements about Clarke and financial decisions made by the Board or previous members of the Board.

86.     On or about April 7, 2020, Clarke filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), which was dually filed with the Idaho Human Rights Commission.

87.     Clarke received his Notice of Right to Sue on or about April 10, 2020.  Clarke has exhausted his administrative remedies.

## COUNT I
## BREACH OF CONTRACT
### (As Against White Pine)

88.   Plaintiff realleges and incorporates by reference paragraphs 1 through 87 above, as though fully incorporated herein.

89.   White Pine and Clarke had an existing contract, either the 2023 Administrator Contract or the 2020 Administrator Contract.

90.   Clarke was not in material breach of his contractual duties to White Pine and had a little over three years remaining on his 2023 Administrator Contract and/or three months remaining on his 2020 Administrator Contract.

91.   White Pine materially breached its contractual obligations to Clarke.  Such breach includes, but are not limited to:

   a.   attempting to void his 2023 Administrator Contract;

   b.   rescinding his paid administrative leave;

   c.   removing him and terminating him from his position without notice, without informing him of the reasons for removal, without legal justification, and without the due process promises made and the due process protections and guarantees required by Idaho Code and school district policy, both of which were incorporated into the Administrator Contracts;

   d.   refusing to pay him the salary and benefits promised for the remaining time period of the Administrator Contracts; and

   e.   failing to consider extending his Administrator Contract.

92.   Clarke is owed his unpaid salary and benefits under the terms of the 2023 Administrator Contract.  Even if the 2023 Administrator Contract is void, Clarke is owed the unpaid salary and benefits under the 2020 Administrator Contract.

93.   White Pine's failure to pay Clarke the wages he is owed under the terms of the 2023 or 2020 Administrator Contracts is a breach of contract.

94. As a result of White Pine's failure to pay Clarke his wages due and owing pursuant to the Administrator Contracts, Clarke has suffered economic damages and will continue to suffer economic damages as a result of White Pine's failure to pay Clarke's wages and benefits.

### COUNT II
### VIOLATION OF THE IDAHO WAGE CLAIM ACT
### (As Against White Pine)

95. Plaintiff realleges and incorporates by reference paragraphs 1 through 94 above, as though fully incorporated herein.

96. White Pine's failure to pay Clarke the wages he is owed is a violation of the Idaho Wage Claim Act, Idaho Code § 45-601, *et seq.*

97. White Pine owed Clarke wages pursuant to his Administrator Contracts.

98. White Pine failed and refused to pay Clarke his wages pursuant to his Administrator Contracts.

99. As a result of White Pine's failure to pay Clarke his wages due and owing, Clarke is entitled to either the unpaid wages plus penalties provided in Idaho Code § 45-607 or damages in the amount of three times the unpaid wages found to be due and owing, whichever is greater.

### COUNT III
### WRONGFUL TERMINATION IN VIOLATION OF
### IDAHO LAW
### (As Against White Pine)

100. Plaintiff realleges and incorporates by reference paragraphs 1 through 99 above, as though fully incorporated herein.

101. At all time relevant hereto, Idaho Code § 33-513(5) prohibited the termination of a school administrator for reasons other than "a material violation of any lawful rules or regulations of the board of trustees or of the state board of education..."

102. At the time he was removed from his administrative position, Clarke had not committed, and

was not informed he had committed, any materials violation of any lawful rules or regulations of the board of trustees or of the state board of education.

103.  The removal of Clarke from his position at White Pine by the Board was, therefore, in violation of Idaho Code § 33-513(5) and Idaho's public policy.

104.  As a result of White Pine's failure to pay Clarke his wages due and owing pursuant to the Administrator Contracts, Clarke has suffered economic damages and will continue to suffer economic damages as a result of White Pine's failure to pay Clarke's wages and benefits.

**COUNT IV**
**VIOLATION OF PROCEDURAL DUE PROCESS - 42 U.S.C. § 1983**
**AND PROMISSORY ESTOPPEL**
**(As Against All Defendants)**

105.  Clarke reallege paragraphs 1 through 104 as if fully incorporated herein.

106.  The Fourteenth Amendment to the United States Constitution prohibits and makes unlawful actions taken by those acting under color of state law which deprive persons of property interests without due process of law.  At a minimum, due process of law requires adequate notice and meaningful opportunity to be heard.

107.  Pursuant to 42 U.S.C. § 1983, every person who, under color of law deprives a citizen of the United States of any rights, privileges or immunities security by the Constitution and laws of the United States, shall be liable to the party injured at law and/or in equity.

108.  Clarke had a constitutionally protected property interest in his position, contract and continued employment with White Pine, as well as his monetary and non-monetary compensation.

109.  Each Defendant is, and at the time the actions taken against Clarke alleged herein, was a "person" within the meaning of Section 1983.

110.  By their actions, each and all of the Defendants unlawfully deprived Clarke of his constitutionally protected property interest and his civil right without due process of law.

111.  The acts, omissions and conduct of the Defendants, and each of them, which caused the unlawful deprivation of Clarke's property interest and civil rights were actions taken under the color and authority of state law.

112.  The actions taken by Defendants in depriving Clarke of his property interest and civil rights represent and were the product of the official policies, customs and/or practices of White Pine.

113.  In taking and implementing such actions the individually named Defendants were the final policy-making authorities and decision makers for White Pine and were acting within their authorities.

114.  To the extent any of the Defendants were not directly and personally involved in the policies, customs, practices and actions resulting in the deprivation of Clarke's property and civil rights, each such Defendant ratified and confirmed the same and, in so doing, acted with deliberate indifference to Clarke's constitutionally protected rights and interests.

115.  To the extent Clarke's discussion with the Board could be considered a "due process hearing," although no notice or the allegations was provided and Clarke was given no opportunity to present evidence, the individual Board members were not impartial, unbiased decision makers.

116.  Defendants, and each of them, are liable to Clarke for deprivation of his constitutionally protected property interests and civil rights.

117.  Furthermore, and in the alternative, Defendants are promissorily estopped to deny Clarke was entitled to a due process hearing because of the following:

      a.   Defendants should have reasonably expected that Clarke would rely on its

representations promising that it would hold a due process hearing after providing

Clarke written notice of the allegations against him;

b.    Clarke relied upon Defendants' representations and promises of a due process

hearing;

c.    Defendants' promise created substantial economic detriment to Clarke for costs and

attorneys fees;

d.    Clarke's reliance was reasonable and justified, and was or should have been

foreseeable to Defendants.

118.   As a result of the actions and inactions of Defendants, Clarke has incurred damages in the

form of past and future pay and benefits, emotional distress, out of pocket costs, attorney

fees, loss of reputation, loss of career track damages, all in amounts to be proven at trial.

## COUNT V
## VIOLATION OF THE AMERICANS WITH
## DISABILITIES ACT/IDAHO HUMAN RIGHTS ACT
### (Failure to Accommodate/Discrimination As Against White Pine)

119.   Clarke realleges and incorporates by reference paragraphs 1 through 118 as though fully set

forth herein.

120.   Clarke had a disability within the meaning of the ADA/IHRA in that he had an impairment

that impacted his neurological system.

121.   Clarke's disability substantially limited his major life activities and/or major bodily

functions, including his ability to concentrate, think, and work.

122.   Clarke's disabilities required that Clarke be accommodated by a leave of absence as

recommended by his doctor and taken through FMLA leave.

123.   Clarke was a qualified individual able to perform  the essential functions of his job with or

without reasonable accommodations.

124.   White Pine failed to accommodate Clarke by refusing to allow Clarke to take a leave of absence and recover so that a due process hearing could be held.

125.   White Pine also discriminated against Clarke by terminating his contractually-protected employment while he was on an authorized leave of absence.

126.   White Pine failed to engage in the interactive process or offer any explanation as to why it could not accommodate Clarke.

127.   Defendant took adverse action against Clarke by refusing to allow Clarke a leave of absence, failing to allow him to recover so he could defend himself against the allegations unknown to him, and terminating Clarke's employment based on unfounded allegations.

128.   As a direct and proximate result of White Pine's actions and/or failures to act, Clarke has suffered, and will continue to suffer,  a loss of earnings, employment benefits, and job-related opportunities.  Clarke is therefore entitled to general and compensatory damages, in an amount to be proven at trial, as well as any other equitable remedies available to him, including reinstatement.

## COUNT VI
## VIOLATION OF THE AMERICANS
## WITH DISABILITIES ACT/IDAHO HUMAN RIGHTS ACT
### (Retaliation As Against White Pine)

129.    Clarke  realleges and incorporates by reference paragraphs 1 through 128 as though fully set forth herein.

130.   Clarke engaged in protected activity by objecting to and asserting his rights under the ADA/IHRA.

131.   In spite of Clarke's complaints and objections, the Board retaliated against Clarke by refusing to allow him to recover from his medical condition for purposes of scheduling a due process hearing and terminating his employment.

132.     As a direct and proximate result of White Pine's actions and/or failure to act, Clarke has suffered, and will continue to suffer, a loss of earning, employment benefits, and job opportunities.  Clarke is therefore entitled to damages in an amount to be proven at trial, as well as any equitable remedies available to him.

### COUNT VII
### VIOLATION OF THE FAMILY MEDICAL LEAVE ACT
#### (Retaliation and Interference As Against All Defendants)

133.     Clarke realleges and incorporates by reference paragraphs 1 through 132 as though fully set forth herein.

134.     Clarke availed himself of a protected right under the FMLA by qualifying for and taking FMLA leave.

135.     Defendants terminated Clarke's employment as a result of Clarke taking and requesting intermittent FMLA leave.

136.     Defendants interfered with Clarke's rights under the FMLA by terminating his employment.

137.     Defendants's termination of Clarke's employment occurred under circumstances raising a reasonable inference or showing direct evidence that Defendants terminated Clarke's employment due to his exercise of FMLA rights or to interfere with his FMLA rights.

138.     As a direct and proximate result of Defendants' actions and/or failures to act, Clarke has suffered, and will continue to suffer, a loss of earnings, employment benefits, and job opportunities.  Clarke is therefore entitled to damages in an amount to be proven at trial, as wells as any equitable remedies available to him, including reinstatement.

139.     Defendants' actions and/or failure to act were in bad faith for which Clarke is entitled to liquidated damages pursuant to 29 U.S.C. § 2617(a)(1).

### COUNT VIII
### DEFAMATION/DEFAMATION *PER SE*
#### (as Against All Defendants)

140.    Plaintiff realleges and incorporates by reference paragraphs 1 through 139 above, as
        though fully incorporated herein.

141.    Defendants communicated information about Clarke to others both orally and through
        written means, including allegations that Clarke had committed an alleged crime.

142.    The information communicated by Defendants was defamatory.

143.    The information communicated by Defendants about Clarke was defamatory *per se*
        because it imputed criminal conduct and attacked Clarke's business standing and
        conduct.

144.    Clarke was and continues to be damaged because of the communications made by
        Defendants.

145.    As a result of Defendants' conduct, Clarke has suffered and continues to suffer damage,
        including but not limited to, loss of reputation, loss of contracts, loss of wages and
        benefits, and emotional distress.

146.    As a result of Defendants' conduct, Clarke is entitled to an award of damages, including
        special and general damage, in an amount to be determined at trial.

## ATTORNEY'S FEES

147.    As a further direct and proximate result of Defendants' actions and/or failure to act,
        Clarke has been compelled to retain the services of counsel, and has incurred and will
        continue to incur costs and attorney's fees. Clarke is therefore entitled to attorney's fees
        and costs incurred in pursuing this action pursuant to 29 U.S.C. § 2617(a)(3), 42 U.S.C. §
        2000e-5(k); 42 U.S.C. § 12205; 42 U.S.C. § 1988, and Idaho Code §§ 12-120(3) and 45-
        615(2), and the Idaho Rules of Civil Procedure, Plaintiff is entitled to an award of his
        attorney's fees and costs in this matter at an amount to be determined upon judgment.  If
        this matter is concluded by default, the amount of $5,000 represents reasonable attorney's

fees, and a greater amount if this matter is not concluded by default.

### DEMAND FOR JURY TRIAL

Clarke demands trial by jury as to all issues triable to a jury in this action.

### PRAYER FOR RELIEF

Clarke seeks the judgment of the Court against Defendants as follows:

1.      For general and compensatory damages, and all other statutorily available

        damages, in an amount to be proven at trial;

2.      For liquidated or treble damages;

3.      For any equitable remedies available to him;

4.      For statutorily available costs and attorney's fees;

5.      For prejudgment interest on all amounts claimed; and

6.      For such other and further relief as the Court deems just and proper.

DATED this 7th day May, 2020.


        _/s/_____
        DeAnne Casperson, Esq.
        CASPERSON ULRICH DUSTIN PLLC